# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00524-CV

---

**Cobb Development and Vance Cobb, Appellants**

**v.**

**Timothy Francis McCabe, Appellee**

---

### FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-000829, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This dispute concerns accusations of fraud levied by a property developer against a competitor. Cobb Development and Vance Cobb (collectively, Cobb) sued Timothy Francis McCabe for tortious interference with current and prospective contracts. The trial court dismissed the claims pursuant to the Texas Citizens' Participation Act (TCPA) and awarded attorney's fees and sanctions to McCabe. *See generally* Tex. Civ. Prac. & Rem. Code §§ 27.001–.011. We affirm.

# BACKGROUND[1]

McCabe, a longtime Austin property developer, has recently focused on developing residential properties on Ford Street. In 2020, he purchased two houses there and had a contract pending on 2022 Ford Street. McCabe discussed his plans—including what he paid for the other properties and what he intended to pay for 2022 Ford Street—with Cobb. Cobb is also a residential property developer working in the same general area of Austin.

In November of 2020, McCabe learned that Compass Bank had listed 2024 Ford Street—next door to 2022 Ford—for sale. McCabe learned from a realtor at the bank that the owner had already accepted an offer and the property was off the market. Matthew Robins, another realtor at Compass, confirmed that he and Cobb were involved in the purchase. After speaking with Robins, McCabe confronted Cobb and accused him of buying the property in a "backroom deal" with Robins. Cobb said that his client, Gareth Tilley, had purchased the property for $750,000, a price that McCabe asserts was $75,000 over the market price. This allegedly resulted in McCabe losing the contract for 2022 Ford because the owner wanted a higher price.

On November 14, 2020, McCabe emailed Cobb that he was declaring "World War" between them. Cobb alleges in his petition that McCabe then "embarked on an aggressive ongoing intimidation campaign by sending dozens of false, malicious, and accusatory emails to Cobb and others" in an "effort to prevent Cobb's construction projects from progressing." At first, McCabe accused Cobb of violating Texas Real Estate Commission rules, doing poor

---

[1] We draw our recitation of the background facts from the pleadings and affidavits, which we set out in the light most favorable to the nonmovant. *See, e.g.*, *RigUp, Inc. v. Sierra Hamilton, LLC*, 613 S.W.3d 177, 182 (Tex. App.—Austin 2020, no pet.) (explaining that court reviewing TCPA motion "views the pleadings and the affidavits in the light most favorable to the nonmovant").

quality work, and having a substance abuse problem.[2]  For example, on December 21, 2020, McCabe sent the following email to Vince Heinz, a realtor at Compass Bank, and Cobb client Joseph Pantaleo, Jr.:

> Subject: Cobb Development? When is a hired hand a "Developer" Austin, Joe, Vince (know it all in design meetings) A Developer has money in the game - a hired hand none. Cobb is a hired hand.  He is not a developer.  See below - maybe not a very good builder. Jessie and its broken foundation stagnates.  A bullshit artist like Mat Robins markets S of Oltorf as Bouldin. . . . see S v4th MLS Check out the quality on Joey P's and Vince's Oxford build in Zilker.  TROUBLE! Ryan James - Under right this junk.  Under Contract for how much longer?

Attached to the email is a picture of the exterior of a residence that Cobb allegedly built.

McCabe, meanwhile, discovered what he believed to be mortgage fraud by Cobb and his associates.  In essence, McCabe alleged that Cobb and his associates fraudulently obtained homestead mortgages for Cobb's clients.  Even though homestead mortgages require the borrower to live on the property, each property was allegedly put up for sale without the borrower ever residing there or intending to reside there.  Because homestead mortgages have low interest rates and require less money down, Cobb's clients could pay higher prices for land. The others allegedly involved in the scheme were Ryan James, a loan officer at First United Bank; and Robins and Heinz, who are realtors at Compass Bank.  The clients who supposedly benefited from this scheme included Tilley, Pantaleo, and Brett Marlier.

In the afternoon of December 29, 2020, McCabe emailed Marlier that McCabe intended to meet with James the following Monday to reach a "workable solution" and instructed Marlier to "Put a collar on Vance Cobb in the mean time.  If he or any of your gang contacts my family - big issue."  Approximately two hours later, McCabe emailed him again to "Collar

---

[2] We reproduce McCabe's emails exactly as they appear in the record.

Vance. Tonight - or I will call Ron and let him know your bank fraud actions to date with evidence. - bury Ryan James and erase your profits deal on Oxford." The same night, McCabe sent an email to Greg Massey, the president of First United Bank; James; Pantaleo; Marlier; and Jeff Youngblood with the FBI:

> Re: Homestead Mortgage Fraud – A conspiracy between First United Austin Loan Office, Credit worthy individuals, Real Estate Brokers and a builder – with zero intention of a homestead.
>
> Mr. Massey, Mr James, F.B.I - Special Agent Jeff Youngblood (BCC) Gentlemen,
>
> Mr. Massey, I endeavor to engage your office, The F.B.I and the Texas Attorney Generals office into an investigation of your Banks loans practices in Austin, Texas. A number - of Homestead Conventional Mortgages with Construction Addendums have been put out there by your Bank - in Austin- where I develop homes - and NONE of them have any intention of fulfilling the Contractual Obligations of the Borrower. - except build and sell – see attachments - THIS WEEK - foundation has not even been poured[.] They borrow the money - build spec and sell - and rely on the sell provision at the Banks discretion to get out of the occupancy provision - see attached Never occupy - never have Ryan James - your Loan Officer - should be able to lay out his current 78704 Clients, his previous history with those Clients at UFCU and his present First United Clients Please look into this.[3]

On December 30, 2020, McCabe emailed Robins and copied Cobb, Marlier, James, and Heinz:

> Matt Robins - There is nothing more that I would like to see is you on the street. You have sown nothing but bad seeds with introduction of Gareth and others to the marketplace - AND dragging my good friend Vance Cobb along - - Matt - you are under criminal investigation I am going to stand up for Vance - Ryan and others - Gonna let you twist in the wind - you are the smartest guy in the room - the mastermind - legend in your own mind . . . . . If you had nothing to hide - why did your online presence change today? As well as others sites. Onwards

---

[3] Although McCabe sent multiple emails that date, we refer to the email sent to Massey as the December 29, 2020 email.

In February 2021, Cobb sued McCabe for tortious interference with existing and prospective contracts and sought injunctive relief. McCabe filed a motion to dismiss under the TCPA and attached his sworn declaration and supporting documents. Cobb filed a response and attached his affidavit and hundreds of McCabe's emails.

Cobb alleges in his affidavit that McCabe interfered with two existing contracts: a contract with Michael Steward[4] to construct a home at 2010 De Verne and one with Laura Pantaleo, the mother of existing client Joseph Pantaleo, Jr., to construct a home at 2901 Cedarview. Regarding the De Verne contract, Cobb states that he and Steward agreed that Cobb

> would build a house for him at 2010 De Verne and that I would work with him and his architect to have plans prepared for the house I would build for him. Soon after that lunch meeting, Steward's architect sent me plans for 2010 De Verne and I prepared a budget based off his plans. Steward agreed to pay me a $120,000 builder fee for building the house depicted in the plans at 2010 De Verne. I understand that he applied for financing with First United Bank and once that had been completed, his loan officer, Ryan James contacted me and requested that I submit the budget and plans for the home I had agreed to build for him to proceed through the appraisal process. A true and correct copy of the plans and budget submitted to First United Bank in connection with my agreement with Steward to build his house at 2010 De Verne are attached as Exhibit I. Following McCabe's December 29, 2020 email detailed above . . . I was promptly removed as an approved builder and First United Bank refused to proceed with financing Steward's "Steward" lot (and tear down house) located at 2010 De Verne, as well as construction financing of the home I had agreed to build for Steward. *Ryan James told [Cobb] that McCabe's communications alleging that I was involved in homestead mortgage fraud had immediately resulted in my removal from First United Bank's approved builder list. James then contacted Steward and let him know that First United Bank could not proceed with financing the lot and build at 2010 De Verne as a result of McCabe's disparaging and false claims that I was involved in homestead mortgage fraud.*

---

[4] Steward's last name is spelled "Stewart" in several parts of Cobb's affidavit but "Steward" in Cobb's brief. Cobb states in his reply that the correct spelling is Steward, so we have corrected the spelling in the affidavit accordingly.

This caused my agreement with Steward to build a house for him based on the plans and budget detailed in Exhibit I on 2010 De Verne to end because his financing would not be approved[.]

(emphasis added). Regarding the Cedarview contract, Cobb states:

My client, Joe Pantaleo, Jr. initially contacted me and told me that his mother, Laura Pantaleo wanted to build a home in Austin, Texas. Following this discussion and conversations with Ms. Pantaleo, I contacted an architect, Arthur Furman with Side Angle Side Architects, and he prepared plans for Ms. Pantaleo's home. Once the plans were complete and reviewed by Ms. Pantaleo and I prepared a budget, she agreed that I would build her a home at 2901 Cedarview. A true and correct copy of the plans and budget are attached as Exhibit J. She then contacted First United to arrange financing and I subsequently sent the plans and budget to Ryan James.

Following McCabe's December 29, 2020 email detailed above and attached as Exhibit D, I was promptly removed as an approved builder and First United Bank refused to proceed with financing Ms. Pantaleo's property located at 2901 Cedarview, as well as construction financing of the home I had agreed to build for Ms. Pantaleo. *Ryan James told me that McCabe's communications alleging that I was involved in homestead mortgage fraud had immediately resulted in my removal from First United Bank's approved builder list. James then contacted Ms. Pantaleo and let her know that First United Bank could not proceed with financing the lot and build at 2901 Cedarview as a result of McCabe's disparaging and false claims that I was involved in homestead mortgage fraud.*

After McCabe's false and disparaging claims to the bank, Ms. Pantaleo cancelled our agreement to build a house for her based on the plans and budget detailed in Exhibit J on 2901 Cedarview because her financing would not be approved as a direct and proximate cause of McCabe causing First United Bank to remove me from the approved builder list following his false and disparaging homestead mortgage fraud communications with First United Bank's president/CEO Greg Massey and loan officer, Ryan James.

(emphasis added). McCabe objected to the italicized portions as hearsay. McCabe filed a response and attached his sworn declaration. On May 20, 2021, the trial court issued an interlocutory order sustaining the objections and granting the motion to dismiss.

6

McCabe then asked the trial court to award him $181,204.32 in attorney's fees, additional court costs, and no less than $150,000 in sanctions. Cobb filed a response arguing the requested fees were excessive and the sanctions unwarranted. Cobb also filed a motion for reconsideration and attached emails and texts that McCabe sent after the trial court's interlocutory order. The trial court held a hearing on both motions and later signed a judgment granting the motion to dismiss and awarding McCabe $150,000 in attorney's fees, conditional appellate fees, and $60,000 in sanctions. This appeal ensued.

**LEGAL STANDARDS**

The TCPA "protects speech on matters of public concern by authorizing courts to conduct an early and expedited review of the legal merit of claims that seek to stifle speech through the imposition of civil liability and damages." *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023). To accomplish this objective, the TCPA provides a three-step process for the dismissal of any "legal action" to which it applies. *Montelongo v. Abrea*, 622 S.W.3d 290, 296 (Tex. 2021). First, the movant must demonstrate that the "legal action" against it is "based on or is in response to" the movant's "exercise of the right of free speech, right to petition, or right of association." Tex. Civ. Prac. & Rem. Code § 27.003(a). If the movant meets that burden, the nonmovant may avoid dismissal by establishing "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Alternatively, the nonmovant may demonstrate that one of the TCPA's exemptions applies. *See id.* § 27.010(a). If the TCPA applies and the nonmovant establishes a prima face case, the burden shifts back to the movant to establish "an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id.* § 27.005(d).

7

In deciding "whether a legal action is subject to or should be dismissed under this chapter, the court shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a). The court "views the pleadings and the affidavits in the light most favorable to the nonmovant." *RigUp, Inc. v. Sierra Hamilton, LLC*, 613 S.W.3d 177, 182 (Tex. App.—Austin 2020, no pet.). We review de novo whether each party met its burden. *Crossroads Cattle Co., Ltd. v. AGEX Trading, LLC*, 607 S.W.3d 98, 101 (Tex. App.—Austin 2020, no pet.).

## DISCUSSION

Cobb argues in six issues, which we have reordered and renumbered, that (1) McCabe failed to demonstrate that the TCPA applies to Cobb's claims or, in the alternative, that (2) the commercial-speech exception applies. If we disagree, Cobb argues that (3) he established a prima facie case for both claims, (4) McCabe failed to establish the defense of justification, (5) the award of fees and sanctions should be set aside, and (6) the trial court erred by implicitly denying Cobb's motion for reconsideration.

### Application

First, Cobb argues that McCabe failed to show that the TCPA applies. *See* Tex. Civ. Prac. & Rem. Code § 27.003(a). McCabe responds that the TCPA applies because Cobb's claims arise from McCabe's exercise of the right of free speech as defined in the TCPA.[5]

---

[5] McCabe also alleges that Cobb's claims implicate McCabe's right to petition. *See* Tex. Civ. Prac. & Rem. Code § 27.001(4) (defining exercise of right to petition). We do not address that argument because we conclude that Cobb's claims arise from McCabe's exercise of the right to free speech. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written

8

The parties first join issue over whether McCabe must show all his communications are protected by the TCPA. Cobb argues that we must "review each act separately to determine whether the TCPA may apply to the resulting claims" and that some of McCabe's communications are not protected by the TCPA. In other words, he asserts that the trial court should have denied the TCPA motion unless all of McCabe's communications are protected. He argues that *Montelongo*, which interpreted the meaning of "cause of action" in the TCPA, compels this conclusion. *Montelongo*, however, explained that "a cause of action consists not merely of the alleged facts, but also the elements those facts must establish to entitle the claimant to relief." 622 S.W.3d at 301. In other words, "a cause of action" does not consist of all the facts alleged in a pleading but specifically those that entitle the claimant to relief under a legal theory. *See id.* Thus, even if Cobb is correct that some of McCabe's communications are not protected by the TCPA, the question is whether the TCPA protects the communications that allegedly entitle Cobb to relief on his tortious-interference claims. *See id.* at 301 ("[T]he TCPA provides for dismissing a 'legal action,' and courts cannot dismiss a fact or facts." (internal citation omitted)); *Union Pac. R.R. Co. v. Dorsey*, 651 S.W.3d 692, 695 (Tex. App.—Houston [14th Dist.] 2022, no pet.) ("Dismissal under the TCPA is determined on a claim-by-claim basis."); *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 206 (Tex. App.—Austin 2017, pet. dism'd) (concluding nonmovant's proof fell short of "the element-by-element, claim-by-claim exactitude required by the TCPA").

Turning to that question, the TCPA defines the exercise of the right to free speech as "a communication made in connection with a matter of public concern." Tex. Civ. Prac. &

---

opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

9

Rem. Code § 27.001(3). A "matter of public concern" means "a statement or activity regarding," as relevant here, "a matter of political, social, or other interest to the community" or "a subject of concern to the public." *Id.* § 27.001(7)(B), (C). In applying these definitions, we must "not ignore the common meaning of the words being defined." *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 135 (Tex. 2019). The phrase "'matter of public concern' commonly refers to matters 'of political, social, or other concern to the community,' as opposed to purely private matters." *Id.* (quoting *Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017)). Thus, "[t]o be a matter of public concern, a claim must have public relevance beyond the interests of the parties." *Szymonek v. Guzman*, 641 S.W.3d 553, 565 (Tex. App.—Austin 2022, pet. denied).

Cobb argues that the TCPA does not apply because McCabe's "entirely unfounded" statements were made "for harassing and anticompetitive purposes" and have no relevance beyond the pecuniary interests of the parties. *See, e.g., Creative Oil & Gas*, 591 S.W.3d at 136 (holding that suit over "private business communications to third-party purchasers of a single well's production" did not involve matter of public concern); *Bowman v. Fortitude Consulting Grp., Inc.,* No. 14-19-00686-CV, 2020 WL 3967807, at *4 (Tex. App.— Houston [14th Dist.] July 14, 2020, no pet.) (mem. op.) (concluding TCPA did not apply to communications that "related solely to the pecuniary interests of [the parties] and had no potential impact on the broader marketplace or a public audience of potential buyers or sellers"). He argues that it "strains credulity" to consider McCabe's "harassing conduct and abusive comments" to "Cobb, his wife, other family members, and dozens of his clients and business colleagues" as having "any direct relationship" to a matter of public concern. McCabe

10

responds that criminal activity is a matter of public concern and that his emails, especially the December 29, 2020 email, allege that Cobb and others are involved in fraud.

We agree with McCabe. Matters of public concern include, among other things, "commission of a crime." *Brady*, 515 S.W.3d at 884; *see Kadow v. Grauerholz*, No. 02-20-00044-CV, 2021 WL 733302, at *3 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.) (observing that "the commission of a crime is a matter of public concern"); *MediaOne, L.L.C. v. Henderson*, 592 S.W.3d 933, 940 (Tex. App.—Tyler 2019, pet. denied) (holding publication "reporting alleged criminal activity in the community" is matter of public concern). The supreme court's decision in *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890 (Tex. 2018) is instructive. That appeal arose from a long-running dispute between Adams, the developer of the neighborhood where he lived, and the homeowners' association controlled by the developer. *Id.* at 892. The developer sued Adams over statements in emails and a blog accusing the developer and its owners of crimes and other misconduct. *Id.* at 893. The supreme court concluded that the "allegation that a neighborhood developer and the HOA it controls have chopped down residents' trees, generally made life miserable for the residents, and engaged in unspecified other corrupt or criminal activity is of public concern for the residents of the neighborhood." *Id.* at 897.[6] The court stressed that "whether Adams's

___

[6] The supreme court decided *Adams* under a version of the TCPA that defined a matter of public concern as a communication pertaining to, inter alia, "environmental, economic, or community well-being" or "a good, product, or service in the marketplace." Act of May 24, 2011, 82nd Leg., R.S., ch. 341, § 2, sec. 27.001(7)(B), (E), 2011 Tex. Gen. Laws 961, 962. The legislature subsequently eliminated both parts of the definition. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, H.B. 2730, § 11, 2019 Tex. Gen. Laws 684, 687 (effective Sept. 1, 2019). *Adams* remains instructive because the supreme court made clear that Adams' allegation was a matter of public concern even if viewed "apart from the non-exclusive statutory list." *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 896 (Tex. 2018); *see Kadow v. Grauerholz*, No. 02-20-00044-CV, 2021 WL 733302, at *3 n.6 (Tex. App.—Fort

11

colorful allegations were valid, partly valid, or completely concocted by a disgruntled resident with an axe to grind is not the question before us." *Id.*

Here, McCabe alleged in the December 29 email that Cobb worked with bank employees and realtors to enable his clients to borrow money under false pretenses. Cobb argues that McCabe made these allegations to gain a competitive advantage and stresses that McCabe purchased the De Verne property in January 2021 after Steward terminated his deal with Cobb. But the fact that a speaker may gain an advantage in a private dispute by communicating with third parties does not remove the communications from the protection of the TCPA. The issue, rather, is whether the content of the communications has "public relevance beyond the interests of the parties." *Szymonek*, 641 S.W.3d at 565. McCabe's allegations are of concern to others who apply to the bank to finance real estate projects as well as property owners on Ford Street affected by the alleged artificial elevation in prices. *See Adams*, 547 S.W.3d at 896–97. Whether the allegations are "valid, partly valid, or completely concocted" by McCabe because he has an "axe to grind" with Cobb is not the question before us. *See id.* at 897. "The question at this stage is whether [Cobb's] challenged statements involve a 'matter of public concern' as defined by the TCPA." *See id.* For the reasons stated, McCabe's statements are on a matter of public concern even if he made them "for harassing and anticompetitive purposes" as McCabe alleges.[7] We conclude that McCabe has established that the TCPA applies to Cobb's causes of action and overrule Cobb's first issue.

---

Worth Feb. 25, 2021, no pet.) (mem. op.) (cases decided under prior version remained instructive "because the definition of "matter of public concern" applicable here is broader than the definition under the prior version").

[7]  Cobb equates this case with *Sloat v. Rathbun*, where we concluded that certain "harassing" communications were not matters of public concern. 513 S.W.3d 500 (Tex. App.—

**Commercial Speech Exemption**

Cobb argues in his second issue that the trial court erred because he showed that the commercial-speech exemption applies.

The TCPA does not apply to "a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer." Tex. Civ. Prac. & Rem. Code § 27.010(a)(2). This exception applies only to communications "related to a good, product, or service in the marketplace" that do "no more than propose a commercial transaction." *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 690 (Tex. 2018). The exemption applies when four elements are met. First, "the defendant was primarily engaged in the business of selling or leasing goods." *Id.* at 688. Second, "the defendant made the statement or engaged in the conduct on which the claim is based in the defendant's capacity as a seller or lessor of those goods or services." *Id.* Third, "the statement

Austin 2015, pet. dism'd). That case involved actions by members of the Church of Scientology again two former members of the church. *Id.* at 506. Rathbun sued over church members "standing in protest near Rathbun's property, holding signs of protest, attempting to speak to passers-by or those entering or leaving the property about the impropriety of Marty Rathbun's activities, and filming Marty Rathbun and others in public places." *Id.* This was allegedly "part of the production of a documentary or video about issues of potential or public importance, including importance to Scientologists." *Id.* The alleged issue of public concern was that the Rathburns were supposedly "engaged in the independent practice of Scientology outside the auspices of the Church of Scientology." *Id.* at 507 n.5. We concluded that "it strains credulity to consider the harassing conduct that Rathbun complains of as having any direct relationship to this issue, to the extent it could even be considered a matter of public concern in its own right." *Id.* at 508. Cobb argues that McCabe's behavior is similar because he, for example, allegedly physically obstructed activity at one of Cobb's building sites. Even if some of McCabe's behavior is similar to the challenged conduct in *Sloat*, that behavior is not the basis of Cobb's claims. Rather, Cobb claims arise from McCabe's allegations that Cobb and his business associates fraudulently obtained homestead mortgages. These communications are much more closely connected to a matter of public concern than those in *Sloat*.

or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant provides." *Id.* Fourth, the "intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides." *Id.* "The burden of establishing the commercial-speech exemption is on the nonmovant, the party relying on the exemption." *RigUp*, 613 S.W.3d at 187.

McCabe, like Cobb, is undisputedly primarily in the business of selling residential development services. The third element requires that the statement arise "out of a commercial transaction involving the kind of goods or services the defendant provides." *Castleman*, 546 S.W.3d at 690. To meet this element, "the challenged statement or conduct must be made 'for the purpose of securing sales in the goods or services of the person making the statement.'" *Rose v. Scientific Mach. & Welding, Inc.*, No. 03-18-00721-CV, 2019 WL 2588512, at *6 (Tex. App.—Austin June 25, 2019, no pet.) (mem. op.) (quoting *Toth v. Sears Home Improvement Prods., Inc.*, 557 S.W.3d 142, 154 (Tex. App.—Houston [14th Dist.] 2018, no pet.)); *see Novosad v. LSG Vodka LLC*, No. 03-18-00804-CV, 2020 WL 4726599, at *6 (Tex. App.—Austin July 31, 2020, no pet.) (mem. op.) (explaining that third *Castleman* element "can be restated as asking, relevant here, whether the statement or conduct at issue arose out of the sale of services that the defendant provides"). Cobb argues that the record shows that he and McCabe are "direct competitors" and that this dispute began when one of Cobb's clients purchased a house next to one that McCabe wanted to buy. But McCabe's statements pertain to Cobb's sale of residential development services and whether Cobb violated state and federal laws in providing those services. Cobb does not identify any statement by McCabe that arose out of McCabe's sale of residential development services. We conclude that Cobb has not met his burden to show that the challenged statements arose out of the sale of goods or

14

services that McCabe provides. *See MacFarland v. Le-Vel Brands LLC*, No. 05-16-00672-CV, 2017 WL 1089684, at *9 (Tex. App.—Dallas Mar. 23, 2017, no pet.) (mem. op.) (concluding exemption not applicable because defendant's statement was "not about" defendant's business of selling services); *Backes v. Misko*, 486 S.W.3d 7, 23 (Tex. App.—Dallas 2015, pet. denied) (concluding third element was not satisfied because defendant's statements about competitor made no reference to defendant's business); *Kinney v. BCG Att'y Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *6 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.).

Alternatively, Cobb has not satisfied the fourth *Castleman* element. That element is satisfied when the "intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides." 546 S.W.3d at 690. For purposes of the commercial-speech exception, an "actual or potential customer" is "someone who buys goods or services." *Molina Healthcare, Inc. v. State ex rel. Thurmond*, No. 03-20-00077-CV, 2020 WL 7233609, at *4 (Tex. App.—Austin Dec. 9, 2020, pet. denied) (mem. op.). Cobb sent the December 29, 2020, email to Greg Massey, the president of First United Bank; and James, a loan officer there; and copied Cobb clients Joseph Pantaleo and Marlier. He sent the December 30, 2020 email (at issue in his claim for tortious-interference with a prospective contract), to Robins, James, Marlier, and Heinz. Neither email supports that McCabe was promoting a sale of his own services, and Cobb did not present evidence that any of the recipients are potential customers of McCabe's house development services.[8]

---

[8] Marlier was one of Cobb's clients, meaning that he was once in the market for house development services. However, McCabe alleged elsewhere that Marlier was one of Cobb's clients who fraudulently obtained a mortgage. Cobb did not allege or present evidence that McCabe was soliciting Marlier's business.

15

We conclude that Cobb has not met his burden to show that the commercial-speech exemption applies, and we overrule his second issue.

**Motion for Reconsideration**

Cobb argues in his sixth issue that the trial court erred by refusing to consider the evidence attached to his motion to reconsider. *See* Tex. R. Civ. P. 270 ("When it clearly appears to be necessary to the due administration of justice, the court may permit additional evidence to be offered at any time; provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury."). The trial court, however, scheduled a hearing on Cobb's motion and admitted all the communications attached to the motion into evidence. We reject Cobb's argument that the trial court failed to consider this evidence.

Cobb also argues that the trial court erred by implicitly denying the motion for reconsideration. Because the motion did not raise any new legal issues, we need not separately address the denial of his motion for reconsideration. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). We overrule Cobb's sixth issue.

**Prima Facie Case**

Having concluded that the TCPA applies, we turn to whether Cobb carried his burden to establish by clear and specific evidence a prima facie case for each essential element of his claims. *See* Tex. Civ. Prac. & Rem. Code § 27.005(c).

In this context, "clear and specific evidence" refers to the quality of evidence required, and "prima facie case" refers to the amount of evidence required to satisfy the nonmovant's burden. *RigUp*, 613 S.W.3d at 189. "Clear and specific evidence means that the

16

'plaintiff must provide enough detail to show the factual basis for its claim.'" *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam) (quoting *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015) (orig. proceeding)). "A prima facie case refers to 'evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted.'" *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021) (quoting *Lipsky*, 460 S.W.3d at 590). It is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* at 54.

*Tortious Interference with an Existing Contract*

The elements of a prima facie case for tortious interference with an existing contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Dallas Symphony Ass'n. v. Reyes*, 571 S.W.3d 753, 761 n.38 (Tex. 2019).

We start with proximate cause because it is dispositive here. "Proximate cause encompasses both foreseeability and cause in fact." *Memorial Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 427 (Tex. 2022). "The general test for cause in fact is whether the defendant's act was 'a substantial factor in causing the injury and without which the injury would not have occurred.'" *Id.* (quoting *Anderson v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018)). An injury is foreseeable "if a person of ordinary intelligence and prudence would have reasonably anticipated it under the circumstances." *Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*, 525 S.W.3d 875, 880 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)).

17

Cobb argues that his affidavit is evidence that the December 29, 2020 email caused First United Bank to remove him from the approved builders list and "refuse[] to proceed with financing the construction," resulting in his clients canceling their contracts.[9] McCabe responds that the affidavit is conclusory because it contains no supporting facts. *See Lipsky*, 460 S.W.3d at 592–93 ("Bare, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA. Opinions must be based on demonstrable facts and a reasoned basis." (internal citations omitted)). We agree with McCabe. Removing the statements stricken by the trial court, Cobb's affidavit does not contain "clear and specific" evidence that the December 29, 2020 email caused First United Bank to remove Cobb from the approved builder's list or deny funding for his clients. Nor does the affidavit contain facts supporting his assertion that First United Bank's denial of funding caused Cobb's clients to cancel their contracts. *See Van Der Linden v. Khan*, 535 S.W.3d 179, 194 (Tex. App.—Fort Worth 2017, pet. denied) (observing that "conjecture, guess, or speculation" regarding causation cannot survive "clear and specific" scrutiny).

Cobb insists that two of McCabe's emails sent after the trial court's interlocutory ruling supply the missing evidence of causation. On June 17, 2021, McCabe sent the following email to Ryan James:

---

[9] We assume without deciding that both clients breached a binding provision of their contracts by canceling. *See Fred Lupfer & Advanced Pub. Ins. Adjusters, LLC v. Beneke*, No. 03-19-00845-CV, 2021 WL 5225429, at *5 (Tex. App.—Austin Nov. 10, 2021, no pet.) (mem. op.) ("To maintain a tortious-interference claim, a plaintiff must . . . show that 'some obligatory provision of a contract has been breached.'" (quoting *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App.—Fort Worth 2009, pet. denied))).

18

Interesting- Vance Cobb essentially sued me for interfering in 2 Homestead

Mortgage loans - one to Joe's Mother - and another - and - 6. with [Steward] Millies signatures - 2 - your bank Bank failed to fund. Failed to fund for a reason. - December notice to Greg Massey. Copied. Mortgage Fraud

Less than an hour later, McCabe forwarded the same email to James with the message "Not bluffing - we are behind that." Cobb interprets these emails as an admission that McCabe's December 29, 2020 email caused the termination of both contracts. But there are several independent decisions by third parties between Cobb sending the emails and Steward and Pantaleo terminating their contracts, and Cobb did not present any "clear and specific" evidence that the emails caused those decisions. For example, Cobb did not present any evidence that the Bank removed him as an approved builder or why they did so or why the customers terminated their contracts with Cobb. Further, neither email permits an inference that the denial of financing to Steward and Laura Pantaleo caused them to terminate their contracts with Cobb. Nor did Cobb provide additional facts permitting an inference of a causal relationship. At most, Cobb's affidavit shows that the denial of funding and the termination of the contracts occurred in close temporal proximity to one another.[10] Without more, the trial court was left to speculate about the causal relationship between the two events. *See Van Der Linden*, 535 S.W.3d at 194 ("Cause in fact . . . cannot be established by mere conjecture, guess, or speculation.").

We conclude that Cobb failed to carry his burden to provide clear and specific evidence that McCabe's December 29, 2021 email was a substantial factor leading to Steward and Laura Pantaleo terminating their contracts. *See id.* at 195 (concluding that proof that communication and breach "occurred in very close temporal proximity to one another" was not

___

[10] The record does not include either termination date, but Cobb states in the affidavit that McCabe purchased the De Verne property in January 2021.

19

prima facie evidence of causation); *see also Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014) (holding that "the jury cannot reasonably infer that defamation caused the cancellations when the [business] cancellations could have occurred for any number of reasons," particularly since appellee never asked customers about reasons for cancelation). The trial court did not err in granting McCabe's motion to dismiss this claim.

*Tortious Interference with Prospective Contracts*

The elements of tortious interference with prospective contracts are: (1) "a reasonable probability that the plaintiff would have entered into a business relationship with a third party," (2) "the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct," (3) "the defendant's conduct was independently tortious or unlawful," (4) "the interference proximately caused the plaintiff injury," and (5) "the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).

Cobb alleges that he has an "ongoing business relationship" with Heinz, Compass Bank, Robins, Tilley, Pantaleo, and Marlier and that McCabe has taken actions to interfere with those relationships. He cites the emails of December 29 and 30, among others, and alleges:

> Each time McCabe contacted Heinz, Robins, Tilley, Pantaleo, Marlier, or others that I had worked with in the real estate industry, it reduced the likelihood I would obtain any additional builds for them due not only to the false statements that McCabe was making about me but also their desire themselves from McCabe as much as possible. With McCabe's vicious obsession with me, Heinz and Robins

20

have intimated that they need to distance themselves as much as possible from me while McCabe continues his concerning threats and false statements about them, even if that meant not referring potential clients to me.

Cobb further states that he:

witnessed an increased reluctance of many of my clients and business associates to engage me on new projects since McCabe started his "World War" on me. It has become well-known in the Austin real estate industry that McCabe is seeking to destroy me at any cost and that they will likely start receiving this from McCabe if they sign on as a customer, client, or provider of mine.

As an example of a lost potential contract, Cobb avers that he "was contacted by a potential customer, Chloe Chiang to build a house for her at 1611 Canterbury, Austin, Texas and, following McCabe's continued disparaging comments, she was unable to move forward with financing with me as the builder." Cobb concedes that this falls short of a prima facie case if viewed "in a vacuum" but urges us to view it in context of the other evidence. More specifically, he argues that "the lost sale to Chiang follows the exact same pattern as the De Verne and Cedarview properties," and that "there is so much other proof of what McCabe did to damage Cobb in McCabe's own emails and texts, all of which are in the record."

Cobb provided no details regarding the potential contract other than the fact that she "contacted" him about building a house on a particular lot. Evidence of "mere negotiations" does not suffice to show a reasonable probability that a contract would have been formed. *See Camp v. Patterson*, No. 03-16-00733-CV, 2017 WL 3378904, at *8 (Tex. App.—Austin Aug. 3, 2017, no pet.) (mem. op.) (citing *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)). Rather, Cobb had the burden to establish a prima facie case that McCabe "interfered with a reasonably probable contract that would have been entered into but for the interference." *See Coinmach*, 417 S.W.3d

21

at 924. Cobb essentially argues that it is reasonable to assume that he would have signed a contract with Chiang but for McCabe's communications, but "assumptions—even reasonable ones—are not evidence." *Camp*, 2017 WL 3378904, at *8. Viewing the pleadings and evidence in the light most favorable to Cobb, we cannot conclude that the factual allegations provide enough detail to support a rational inference that it is reasonably certain he would have signed a contract with Chiang but for McCabe's interference. *See id*.

Cobb argues more generally that McCabe "unquestionably caused [Cobb] to lose business" by "send[ing] harassing and threatening emails to anyone who works with Cobb." Even if it is reasonable to infer that all the recipients of McCabe's communications have stopped doing business with Cobb—a matter that McCabe disputes—Cobb has not alleged that any contracts involving them advanced beyond "mere negotiations." *See id*. We conclude that Cobb failed to establish a prima facie case that it was reasonably probable he would have entered a business relationship with Chiang but for McCabe's interference. The trial court did not err by granting McCabe's motion to dismiss this claim. *See id.* (reversing denial of TCPA motion because there is "no evidence of a specific party with whom Patterson had a reasonable probability of entering into a business relationship absent Camp's emails").

We overrule Cobb's third issue. We do not reach Cobb's fourth issue, which challenges McCabe's justification defense, because it is unnecessary in light of our disposition of his third issue. *See* Tex. R. App. P. 47.1.

**Attorneys' Fees and Sanctions**

Cobb challenges the award of $150,000 in attorney's fees and $60,000 in sanctions in his final issue. *See* Tex. Civ. Prac. & Rem. Code § 27.009(a).

22

*Attorney's Fees*

If a trial court grants a motion to dismiss, the TCPA requires the court to award the movant its "reasonable attorney's fees incurred in defending against the legal action." *Id.* § 27.009(a)(1). A "reasonable" attorney's fee "is one that is not excessive or extreme, but rather moderate or fair." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). We review a trial court's award of fees for an abuse of discretion. *See id.*; *Broder v. Nexstar Broad. Grp., Inc.*, 2021 WL 2273470, at *15 (Tex. App.—Austin June 4, 2021, no pet.) (mem. op.). A trial court abuses its discretion when its "ruling is arbitrary and unreasonable, made without regard for guiding legal principles or supporting evidence." *In re State Farm Mut. Auto. Ins.*, 629 S.W.3d 866, 872 (Tex. 2021) (orig. proceeding).

In determining the reasonableness and necessity of attorney's fees in a fee-shifting situation, the factfinder first "determine[s] the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work" and "then multiplies the number of such hours by the applicable rate, the product of which is the base fee or lodestar." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 494 (Tex. 2019) (citing *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012)). Sufficient evidence "includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 498. The base lodestar calculation, when supported by sufficient evidence, is presumed to "reflect[ ] the reasonable and necessary attorney's fees that can be shifted to the non-prevailing party." *Id.* at 499.

23

In support of his request for fees, McCabe submitted invoices, time entries, the resumes of his counsel, and a sworn declaration from his lead counsel, Paul Trahan.[11] Trahan stated that he worked on the case with the assistance of an associate at his law firm, Ashley Kuempel, and a legal assistant. Their invoices reflect a previously agreed 15% discount on their normal rates of $795, $635, and $295, respectively. In his declaration, Trahan discusses the tasks performed, including negotiating and drafting a Rule 11 agreement where the parties agreed to forgo a hearing on Cobb's request for a temporary injunction, writing and reviewing pleadings, motions, and responses; drafting evidentiary objections and responding to Cobb's own objections; drafting discovery; preparing for various hearings; investigating the factual basis of Cobb's claims and possible defenses; and researching issues related to the TCPA, such as whether it applied to Cobb's interference claims, the procedural steps for securing a dismissal under the TCPA, and the scope of recoverable fees and sanctions. Trahan testified that based on more than two decades of experience in complex commercial litigation in Travis County, these services were necessary, and the rates are reasonable for the time and place where the services were performed. Cobb's counsel submitted his own declaration opining that the hourly rates are not reasonable and that many of the billed services are excessive. The trial court awarded $150,000 in fees.

First, Cobb argues that the trial court abused its discretion because the record shows that Trahan's hourly rate is "out of line with Travis County community standards." *See Rohrmoos Venture*, 578 S.W.3d at 500 (explaining lodestar calculation should include "the fee

---

[11]  Trahan subsequently submitted two supplemental declarations authenticating billing records for tasks performed after the original declaration. Cobb's counsel also submitted supplemental declarations. We refer to all declarations submitted by each counsel as a single document.

customarily charged in the locality for similar legal services"). As evidence, he cites a survey published in the National Law Journal (and attached to Trahan's declaration) that allegedly "shows for the most part that local, average, hourly rates are below what McCabe's counsel charged him." But that survey shows that as of January 1, 2020, partners at firms with over 150 lawyers in Travis County charged between $300-800 an hour. Even if the survey results conclusively establish the range of reasonable hourly rates in Travis County, it does not refute Trahan's testimony that his hourly rate was consistent with that "customarily charged in the locality for similar legal services." *See Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (stating that there is no abuse of discretion "if some evidence reasonably supports the court's ruling").

Next, Cobb argues that an award of $150,000 is "incommensurate with the procedural posture of this case" and a "shocking award for handling a single substantive motion." More specifically, Cobb argues that there is no evidence that certain services were reasonable:

- 59.5 hours billed in April of 2021 for "TCPA research and drafting activities";

- 70 hours for drafting and revising McCabe's motion to dismiss and supporting declarations, which collectively comprise thirty pages;

- 39.9 hours over three days in preparation for hearing on his motion to dismiss, which was held in half a day; and

- 40 hours on McCabe's motion for costs, fees, and sanctions.

We disagree. Trahan explained in the declaration that McCabe's legal team was required to "dedicate a significant amount of time" to the case because the TCPA had recently been amended, which required McCabe's legal team to "to interpret and apply the statute's

25

revised provisions to this case with little guidance from the courts or past precedent." The invoices admittedly reflect that McCabe's legal team spent significant time researching various facets of the TCPA and drafting pleadings, but the trial court reduced McCabe's fee request by $30,000. *See Broder*, 2021 WL 2273470, at \*15 (upholding fee award even though invoices "reflect that the associate spent considerable hours drafting certain pleadings that were then reviewed and reworked by the more senior attorneys," in part because trial court "struck seventeen hours of the associate's billed time"). Moreover, the fee award was not only for "handling a single substantive motion." As laid out in Trahan's declaration, McCabe's counsel also billed for negotiating and drafting a Rule 11 agreement, investigating the factual basis of Cobb's claims, preparing third party subpoenas, writing and reviewing pleadings, drafting a motion for expedited discovery, drafting evidentiary objections, and responding to Cobb's objections. While Cobb's counsel opines in his declaration that the rates are "unreasonably high" and the services were neither reasonable nor necessary, the trial court was within its discretion to credit McCabe's evidence over Cobb's.[12] *See Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) ("The trial court does not abuse its discretion if it bases its

---

[12] Cobb also objects that "out of $158,568.45 billed by Defendant's counsel up to June 19, 2021, $91,548.00 consists of 169.6 hours billed at an effective hourly rate of $540 by an individual not licensed to practice law in Texas." This refers to Ashley Kuempel, the law firm associate who worked on the case under Trahan's supervision. Trahan states in his declaration that Kuempel was not admitted to the Texas Bar at the time she performed these services—but was admitted in New York—and explains why her rate is reasonable given her qualifications. Cobb's counsel asserts in his first supplemental declaration that Kuempel's hourly rate would be excessive for someone of comparable experience licensed in Texas. To the extent Cobb makes the same argument here, we reject it because the trial court could have credited Trahan's explanation regarding why her credentials justified her hourly rate. *See Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (stating trial court does not abuse its discretion by basing ruling on conflicting evidence and some evidence supports ruling). But if Cobb means that Kuempel's work should be reimbursed at a rate lower than an attorney licensed in Texas with similar experience, he has not explained why her licensure status lowers the value of her services.

26

decision on conflicting evidence and some evidence supports its decision."); *Serafine v. Crump*, 665 S.W.3d 93, 107 (Tex. App.—Austin 2023, pet. filed) (same). Considering the entire record and applying the factors set out in *Rohrmoos Venture*, 578 S.W.3d at 494, we cannot conclude that the trial court abused its discretion in its award of attorney's fees to McCabe. *See Broder*, 2021 WL 2273470, at *15–18.

*Sanctions*

We next consider the award of $60,000 in sanctions. The TCPA provides that the trial court "may award to the moving party sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter." Tex. Civ. Prac. & Rem. Code § 27.009(a)(2). We review an award of sanctions for an abuse of discretion. *Landry's*, 631 S.W.3d at 46. The TCPA affords the trial court "broad discretion to determine the amount that is sufficient to achieve the statutory goal of deterrence." *1st & Trinity Super Majority, LLC v. Milligan*, 657 S.W.3d 349, 380 (Tex. App.—El Paso 2022, no pet.). Factors relevant in considering whether to impose sanctions include, among others, the amount of attorney's fees and costs incurred, the plaintiff's history of bringing similar actions, *LMP Austin English Aire, LLC through Lafayette English Partner, LLC v. Lafayette English Apartments, LP*, 654 S.W.3d 265, 292–93 (Tex. App.—Austin 2022, no pet.), and "any aggravating misconduct," *ADB Interest, LLC v. Wallace*, 606 S.W.3d 413, 443 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).[13]

---

[13] The TCPA previously "required a trial court to award 'some amount of sanctions' even if 'only a nominal amount.'" *1st & Trinity Super Majority, LLC v. Milligan*, 657 S.W.3d 349, 378 (Tex. App.—El Paso 2022, no pet.) (quoting *Rich v. Range Res. Corp.*, 535 S.W.3d 610, 613 (Tex. App.—Fort Worth 2017, pet. denied)). The legislature recently amended the TCPA to make an award of sanctions discretionary. *Id.* at 379 & n.11. We apply

Cobb argues that there is no evidence that sanctioning him any amount is necessary to deter him from bringing a similar legal action in the future. McCabe responds that Cobb's suit was an effort "to silence and retaliate against" McCabe that constitutes aggravating misconduct. McCabe argues that such aggravating conduct would justify a much more substantial award, one equal to the "ill-gotten profits related to the four properties central to Cobb's illegal homestead mortgage fraud scheme." The trial court therefore did not abuse its discretion by awarding the substantially lower sum of $60,000.

Although we do not agree that Cobb's actions constitute aggravating misconduct, the trial court did not abuse its discretion. The trial court could have considered the history of the litigation, including that Cobb filed two unsuccessful motions to hold McCabe in contempt for violating a temporary restraining order and an agreed temporary injunction and that Cobb filed an unsuccessful motion to reconsider the grant of the McCabe's motion. *See Borgelt v. Austin Firefighters Ass'n, IAFF Local 975*, No. 03-21-00227-CV, 2022 WL 17096786, at \*19 (Tex. App.—Austin Nov. 22, 2022, pet. filed) (mem. op.) (approving of trial court's consideration of nonmovant's "unsuccessful delayed request for reconsideration of the TCPA order and their threat to file a TCPA motion in response to the Association's motion for TCPA attorneys' fees and sanctions"); *LMP Austin English Aire*, 654 S.W.3d at 293 (concluding that trial court could consider that nonmovant filed an unsuccessful motion for sanctions). Finally, the $60,000 sanctions award is less than half the award of attorney's fees and substantially less than the $400,000 McCabe requested. *See Borgelt*, 2022 WL 17096786, at \*19 (upholding

the same factors courts use to review the amount of sanctions to reviewing the decision to impose sanctions. *See id.* at 380 ("In determining the amount of a sanction under the TCPA, a trial court should consider the parties' litigation history, just as it should in determining whether a sanction is warranted in the first place.").

28

sanctions award that was "substantially less than the $230,000 requested by the Association and is also substantially less than the award of $115,250 in attorneys' fees"); *LMP Austin English Aire*, 654 S.W.3d at 293 (upholding award of $50,203 in sanctions, an amount "less than but nearly equal to the award of TCPA attorney's fees"). Given the broad discretion provided by the TCPA, we cannot conclude that the trial court abused its discretion by awarding $60,000 in sanctions. *See State Farm Mut. Auto. Ins.*, 629 S.W.3d at 872.

Having concluded the trial court did not abuse its discretion in the award of attorney's fees or sanctions, we overrule Cobb's fifth issue.

## CONCLUSION

We affirm the trial court's judgment.

_____

Rosa Lopez Theofanis, Justice

Before Justices Baker, Triana and Theofanis

Affirmed

Filed:   June 15, 2023